UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GALLATIN POWER PARTNERS, LLC,

              Plaintiff,

    -against-

CITRINE SOLAR LLC,

              Defendant.

Case No. 26-cv-2018

**COMPLAINT**

Gallatin Power Partners, LLC ("Gallatin" or "Plaintiff"), by and through its attorneys, files this Complaint against Citrine Solar LLC ("Citrine" or "Defendant"), and alleges as follows:

## INTRODUCTION

1.      This case arises out of the planned sale of a solar and battery storage project (the "Project") in Broadwater County, Montana.  On March 20, 2023, Citrine signed a Membership Interest Purchase Agreement ("MIPA") with Gallatin for the sale of its interests in Trident Solar I, LLC ("Trident Solar"), the company developing the Project.

2.      Despite having entered into a binding contract to acquire Gallatin's interests in Trident Solar, Citrine began expressing in May 2025 that it did not want to move forward with the acquisition because the economics of the Project were no longer beneficial.

3.      Specifically, in response to an update from Gallatin regarding progress on the only remaining condition precedent to closing, Citrine responded "I appreciate the update. However, as we discussed before, ***the project is far from penciling*** under the QF contract structure, ***so a win in the courts is not necessarily helpful at this point***. Our team is soliciting a refresh on BESS/EPC quotes to get a more current estimate of the gap, but ***based on where the market is, I believe these will continue to push the project in the wrong direction***." (emphasis added).

4.     In light of Citrine's apparent intent to renege on its contractual promises, Gallatin demanded assurances on October 29, 2025 that Citrine still planned to fulfill its purchase obligations under the MIPA.

5.     Instead of providing those assurances as required by law, Citrine spent months dragging its feet and then created non-existent closing requirements and purported to manufacture baseless claims of contractual breach in an effort to avoid performing their obligations.

6.     Citrine's bad faith culminated in a December 1, 2025 letter purporting to respond to Gallatin's request to close, following its satisfaction of all conditions precedent, by baldly asserting, for the first time, that Gallatin was in material breach of the MIPA and expressing its "inten[t] to terminate the MIPA" if, within twenty days, Gallatin had not "cured" certain breaches which Citrine also characterized in the same letter as being breaches that Gallatin had "no ability to cure," thus making it clear that Citrine had no plan to discharge its purchase obligations.

7.     Despite the fact that the "breaches" raised in Citrine's December 1 letter were not breaches at all, Gallatin still waited an additional week until even those manufactured breaches had been resolved before *again* requesting that Citrine comply with its contractual obligation to close on the purchase it had decided no longer served its economic interests.

8.    Although Citrine had no viable arguments that Gallatin had not satisfied its closing obligations under the MIPA, Citrine still refused to move forward with closing the acquisition.

9.    Before December 1, 2025, but certainly no later than December 8, 2025, Gallatin had satisfied each of its conditions precedent to closing the acquisition. The Parties were therefore required to proceed to closing under the MIPA.

10.    Instead, through a series of letters and emails, Citrine continued to shirk its plain obligations, ultimately (and baselessly) claiming to have terminated the MIPA and absolved itself of its duty to close on a purchase that it no longer found to be economically attractive.

11.    Gallatin was thus given no choice but to commence this proceeding and enforce its rights.

## THE PARTIES

12.    Gallatin is a limited liability company formed under the laws of Montana.

13.    Gallatin's sole owner and member is also located in Montana.

14.    Citrine is a limited liability company formed under the laws of Delaware and a wholly owned subsidiary of Greenbacker Renewable Energy Corporation ("Greenbacker").

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.    This Court has personal jurisdiction over Citrine because Citrine irrevocably submitted to the jurisdiction of the United States District Court for the Southern District of New York, through which it waived any right to assert that it is not subject personally to the jurisdiction of New York.  MIPA § 10.6.

17.    Venue is proper under 28 U.S.C. § 1391 because the Agreement provides for exclusive venue in this District.

## FACTUAL BACKGROUND

### A. Relevant Parties

18.    Gallatin is a renewable energy development firm headquartered in Bozeman, Montana that primarily develops solar and battery projects.  Gallatin holds 100% of the ownership interesting in Trident Solar I, LLC, a Montana limited liability company formed for the purpose of developing a combined solar electric generation and battery energy storage facility (the "Project") in Broadwater County, Montana.

19.    Greenbacker is an investment manager and independent power producer that executed a Parent Guaranty as to Citrine's performance obligations

under the MIPA, binding itself thereto as well. Citrine is wholly owned by Greenbacker.

20.    NorthWestern Corporation ("NorthWestern") is a utility company primarily serving South Dakota, Nebraska and Montana.

21.    Gallatin commenced negotiations with NorthWestern in 2021 to enter into a Power Purchase Agreement ("PPA") for the sale of the energy produced by the Project. Following a lengthy negotiation process in which Citrine was closely involved, Gallatin ultimately executed the PPA with NorthWestern on November 9, 2023.

22.    On February 25, 2023, Gallatin executed a Standard Large Generator Interconnection Agreement ("LGIA") with NorthWestern to define the terms for connecting the Project to the power grid.

23.    On March 20, 2023, Gallatin executed a Membership Purchase Agreement ("MIPA") with Citrine in which Gallatin would sell 100% of its ownership interests in Trident Solar to Citrine, subject to certain conditions described in the MIPA, and with Greenbacker serving as the Buyer Guarantor.

24.    As is frequently the case with the sale of solar and battery storage projects, the MIPA accounted for the fact that there would be numerous changes to the Project as it developed and before the Parties closed on the acquisition.

Specifically, the MIPA included provisions that dictate how the purchase price would be adjusted to reflect these changes.

25.    It was agreed that changes in the economics of the Project would not be a basis on which to avoid closing or to terminate the MIPA.

26.    Instead, under the MIPA, Citrine was obligated to purchase the ownership interests in Trident Solar for the designated purchase price (subject to all adjustments enumerated in the MIPA), following the completion of certain enumerated conditions precedent.

27.    Pursuant to the Guaranty Agreement, executed by Greenbacker as a condition of Gallatin's agreement to enter and perform under the MIPA, Greenbacker was obligated to pay Gallatin any amount due under the MIPA in the event Citrine failed to pay.

**B. Citrine Begins to Signal its Intent to Breach and Gallatin Seeks Confirmation that Citrine Intends to Perform its Contractual Obligations**

28.    Beginning in May 2025, Citrine began expressing reservations about closing the acquisition because it claimed it no longer believed the Project subject to development was economically viable. These remarks seemed to imply that Citrine was considering refusing to perform under the MIPA with the PPA as negotiated, despite the fact that Citrine had been closely involved in negotiating the PPA terms that determined the Project's economics and the MIPA purchase

price adjustments, and a decline in the Project's economic value was not a permissible basis to walk away from Citrine's promises.

29.    On May 16, 2025, Ms. Fedida at Greenbacker wrote in an email to Adam Schumaker at Gallatin that "I appreciate the update. However, as we discussed before, the project is far from penciling under the QF contract structure, so a win in the courts is not necessarily helpful at this point. Our team is soliciting a refresh on BESS/EPC quotes to get a more current estimate of the gap, but based on where the market is, I believe these will continue to push the project in the wrong direction."

30.    Adam Schumaker at Gallatin responded on May 16, 2025, by noting "...just to be clear, the resolution of the court case is the only outstanding CP [condition precedent] for closing which then triggers the 80% payment under the MIPA, regardless of Greenbacker's perceived economics of the project.  We are willing to brainstorm other off take solutions that could result in better economics, but are in no way agreeing to any changes in the contractual obligations under the MIPA."

31.    In a good-faith attempt to offer additional options to Citrine, Gallatin reached out to Citrine in June 2025 regarding "safe harboring" for the Project. "Safe harboring" is a critical mechanism in renewable energy project development that allows projects to lock in favorable tax incentives prior to new tax policies

taking effect. While it was not Gallatin's responsibility under the MIPA to safe harbor the Project, Gallatin reviewed and proposed to Citrine safe harboring options that could potentially help alleviate any economic strain as alleged by Citrine related to the Project and improve the Project's overall economics.

32.     Citrine again reiterated that the economics of the Project were not as attractive as they had been when Citrine executed the MIPA and rejected the idea of safe harboring the Project because, they claimed, the economics did not justify construction of the Project.

33.     Citrine instead encouraged Gallatin to look for a replacement buyer for the Project rather than honoring their contractual commitment under the MIPA to purchase it themselves.  Because the MIPA did not allow Gallatin to market the Project to other potential buyers as drafted, Gallatin and Citrine finalized the First Amendment to the MIPA in July 2025 to allow Gallatin to market the Project to other parties.

34.     Gallatin continued to invest time and legal resources into looking for other potential buyers who might take up Citrine's purchase obligations as to the Project.  Citrine did not respond to requests for assistance in this process.

35.     Responding to Citrine's repeated hesitancy in moving forward with the deal and comments regarding the Project's viability, and not having found a replacement on Citrine's behalf, Gallatin sent Citrine a letter on October 29, 2025,

confirming that it was on track to meet each of its closing obligations under the MIPA and requesting confirmation from Citrine that it intended to perform its contractual obligations under the MIPA.

36.    Specifically, Gallatin stated "Gallatin also requests that Greenbacker provide written assurance of its intent to fully perform its obligations under the MIPA, and in particular to close on the contemplated transaction, upon satisfaction of all conditions precedent."

37.    Given Citrine's statements over the preceding months, Gallatin requested "written assurance of its intent to fully perform its obligations under the MIPA, including its commitment under Section 5.5 to take all commercially reasonable steps and proceed in good faith to satisfy closing conditions" by November 14, 2025.

38.    On November 17, 2025, Citrine sent a letter in response to Gallatin's October 29, 2025 letter.  While the letter acknowledged receipt of Gallatin's letter, it did not provide the required assurances that Citrine intended to fully perform its obligations under the MIPA, thus breaching Citrine's assurance obligations under Section 10.2 of the MIPA and applicable law more generally.

39.    Gallatin responded to Citrine's letter the same day by email.  Gallatin informed Citrine that NorthWestern had confirmed that they planned to voluntarily dismiss certain FERC Proceedings that week, which would satisfy the final

condition precedent before Citrine's closing obligations vested. Accordingly, Gallatin "expected the MIPA to close no later than five (5) Business Days following dismissal of the FERC Proceeding."

40.    On November 21, 2025, Gallatin notified Citrine that the FERC case had been formally dismissed. Accordingly, it stated that all conditions precedent under the MIPA were now satisfied, establishing December 1, 2025 as the closing date (five days later).

41.    On November 22, 2025, Gallatin also emailed Citrine regarding pulling the project out of suspension under the LGIA, as required under Section 5.1.2 of the PPA following NorthWestern's issuance of the Notice to Proceed, and noted to Citrine that doing so was crucial to avoid jeopardizing the Project schedule.

42.    On November 24, 2025, Citrine emailed Gallatin noting that it was reviewing the documents and sending a draft closing checklist for the transaction.

43.    On November 25, 2025, Gallatin sent Citrine an email with the required closing deliverables.

44.    Later that same day, Gallatin sent Citrine another email again reiterating that the Project needed to be taken out of suspension immediately in order to be in compliance with the PPA, which required the Project to be removed from suspension immediately following issuance of the Notice to Proceed in order to preserve its day for day extension of the Guaranteed Commercial Operation Date.

45.    Gallatin requested confirmation from Citrine that either (i) it was in agreement with removing the project from suspension; or (ii) that it would not use any loss of the day for day Guaranteed Commercial Operation Date extension under Section 5.1.2 of the PPA (as a result of the failure to remove the Project from suspension following issuance of the Notice to Proceed) as a reason not to close the transaction.

46.    Citrine responded the following day, stating that they were still discussing and would not be able to provide an answer to Gallatin's question.  At this point, Citrine had still provided no assurances that it intended to perform under the MIPA and its stalling efforts had been laid bare.

47.    On November 26, 2025, Gallatin again emailed Citrine to pass along an email from NorthWestern regarding the Project's suspension.  The email confirmed that the suspension, pursuant to Article 5.16 of the LGIA, as well as the routine passing of certain performance milestone dates under Appendix B as a result, **did not place the Project in default under the LGIA**.  In this same email, Gallatin again confirmed that it had provided all its closing deliverables.  Despite Gallatin being in full compliance with its obligations under the MIPA, Citrine still did not confirm its intent to perform under the MIPA.

### C. Citrine Refuses to Proceed with Closing Following Satisfaction of the Conditions Precedent

48.     Instead of providing confirmation of its intent to comply with its contractual obligations under the MIPA following Gallatin's October 29 request for assurance and its numerous subsequent emails, Citrine purported to send a Notice of Breach (the "Notice") on December 1, 2025.[1] The Notice baselessly claimed that Gallatin failed to satisfy two conditions precedent to closing, then mischaracterized those alleged failures as a "breach of the MIPA."

49.     *First*, Citrine claimed that Gallatin was "in default of the LGIA now and has no ability to cure" because certain performance milestones contained in Appendix B of the LGIA would not be satisfied at their originally designated dates, prior to the Project's placement in suspension.

50.     This allegation follows from a standard suspension of construction of the Project under Article 5.16 of the LGIA that began on May 30, 2023.  Pursuant to Article 5.16, Gallatin had the right to suspend the Project at any time after sending written notice to NorthWestern.

---

[1] Citrine's Notice of Breach also served as a written dispute notification pursuant to Section 9 of the MIPA, which requires the parties to first raise any dispute via written notification to the other party.  As more than 15 days have passed since receipt of such notice—and the parties' principals discussed the dispute throughout the duration of that period failing to resolve it during not only that period but for months thereafter—the Dispute Resolution requirements in Section 9.1 have been satisfied.

51.    As expected, certain performance milestones would not be met at their originally designated dates due to the passage of time during the suspension of construction.  This is an industry standard practice in the development of energy projects, where such milestone dates are frequently adjusted to reflect new construction schedules as a result of routine delays and suspensions as permitted under interconnection agreements.

52.    Indeed, Citrine had been aware that Gallatin planned to suspend the Project for a period of time since before it even entered the MIPA, and at no point did it raise the suspension as a potential issue.

53.    Despite its awareness and authorization of the suspension, Citrine now claimed that the mere lapse of these milestone dates during the approved suspension somehow constituted a "Default" under the LGIA and therefore a Material Adverse Effect under Section 1.1 of the MIPA.

54.    *Second*, Citrine claimed that even though the FERC Proceedings had been resolved as defined in the MIPA, there remained "other lawsuits pending before in the federal courts that could adversely affect Project Company's Qualifying Facility status," referencing the *SEIA v. FERC* (Case Nos. 21-1126, 21-1136, 21-1142, 21-1149, and 21-1175) Case (the "*SEIA* Case"). Accordingly, Citrine claimed that Gallatin had breached a representation in the MIPA that there is no action pending against the Project Company.

55.     Both claims in the Notice are plainly refuted by the facts, and served as clear attempts to manufacture a breach in order to avoid performing its own purchase obligations under the MIPA.

56.     The mere passage of milestone dates during a period of suspension does not constitute a Breach, where Section 5.16 of the LGIA expressly permits such suspension with the expectation that milestone dates will be reset as appropriate. And Citrine itself conceded in the Notice that it "authorized Seller to place the LGIA in suspension."

57.     Moreover, Citrine was fully aware both (i) that NorthWestern Energy was **the only party with authority to declare a breach under the LGIA;** and (ii) that LGIA had explicitly stated in an email to Gallatin just days before (which Gallatin forwarded to Citrine) that Gallatin "will not be considered in breach of any milestones that have already passed, and the LGIA will be amended to reflect new milestone dates."

58.     As for the second claimed "default," the *SEIA* Case had been adjudicated in full and only the certiorari period remained (and only through December 8, 2025), with the litigant, NorthWestern, already having informed Gallatin that they were withdrawing the appeal, a fact that Gallatin informed Citrine of on November 17, 2025.

59.    Because the *SEIA* Case was adjudicated in full, it did not qualify as an action pending against the Project.  All substantive issues in the Case were already decided, and since no party had initiated further appellate review, there was no Action presently "pending" under Section 3.5 of the MIPA.  The MIPA does not require, and Citrine certainly never identified, any requirement that all appellate opportunities be exhausted for an Action to be considered no longer pending.

60.    Beyond the fact that the issues Citrine identified did not represent unsatisfied conditions precedent to closing, they certainly did not qualify as "breaches" of the MIPA.  The MIPA clearly distinguishes between the non-satisfaction of conditions precedent to closing and breaches of contractual obligations.  The conditions in Article 2 are requirements to be satisfied or waived prior to the parties' obligation to close, not affirmative covenants or ongoing obligations that are independently subject to default and cure provisions.

61.    Notwithstanding, Citrine claimed that Gallatin had "no ability to cure" the alleged "breaches" and expressed its intent to terminate the MIPA within twenty days if those uncurable breaches in fact were not cured by that time.

62.    On December 3, 2025, Gallatin responded to Citrine's Notice.  In a continued effort to move forward with closing as required by the MIPA, Gallatin proposed new milestone deadlines representing a day-for-day transposition of the dates to account for the suspension period (while still maintaining that no breach

had occurred and that new dates were not required for the Parties to progress to closing).

63.    Further, while maintaining that the *SEIA* case did not qualify as an action pending against the Project, Gallatin noted that the *certiorari* period in the *SEIA* Case would expire on December 9, 2025.  At that point, any argument (however baseless) that Citrine did have with respect to Section 3.5 of the MIPA would be moot.

64.    On December 5, 2025, Gallatin provided notice to NorthWestern to bring the LGIA out of suspension.  NorthWestern confirmed that it would revise Appendix B concerning the milestone dates and provide an associated amendment to the LGIA in approximately 30 days.

65.    On December 10, 2025, Gallatin emailed Citrine confirming that the deadline to appeal in the *SEIA* Case, December 8, 2025, had passed.  Given the Parties had still not closed (and the default security date under the PPA had therefore passed), and in light of the appeal period for the *SEIA* Case expiring, Gallatin had requested that NorthWestern reissue the Notice to Proceed.

66.    This reissued Notice to Proceed resolved any outstanding issues Citrine (or Greenbacker) had previously raised.  Under the reissued Notice to Proceed, the new date for the PPA default security was set for December 31, 2025.  Gallatin again reiterated that it had provided all closing deliverables and addressed all

concerns expressed by Citrine (despite the fact that Citrine's alleged concerns lacked merit to begin with). Accordingly, Gallatin expected to close the transaction no later than December 16, 2025.

67. The following day, on December 11, 2025, Citrine sent Gallatin another letter disputing Gallatin's request to close the transaction no later than December 16, 2025 (the "December 11 Letter"). Citrine argued that, while the *SEIA* Case was now fully and finally resolved, the "LGIA Default remains unless and until the LGIA is amended." Citrine then proposed different dates for the performance milestones, reiterating that it did not withdraw its December 1 Notice of Default and stating that its Notice "does not in any way constitute an anticipatory repudiation of the MIPA," notwithstanding its prior representation that in 20 days it intended to terminate the MIPA on the basis of what it characterized as defaults that Gallatin had "no ability to cure."

68. Regardless of Citrine's empty assurances, the fact of the matter remained that Citrine continued to refuse to move forward with closing the acquisition even after Gallatin had fulfilled every obligation under the MIPA.

69. NorthWestern itself affirmed, in writing, that Gallatin **was not in default of the LGIA**. Accordingly, Citrine's only alleged issue preventing it from closing the acquisition was completely fabricated. The December 11 Letter was

nothing more than another manufactured excuse to avoid closing the acquisition as it was obligated to under the MIPA.

70.    While the Parties explored the possibility of a settlement to resolve their disputes following Citrine's continued refusal to perform for a time, no agreement to settle and release legal claims between the Parties was agreed-upon or executed.

### D. Citrine Wrongfully Purports to Terminate the MIPA

71.    On February 24, 2026, Gallatin received the LGIA amendment for execution from NorthWestern, which adopted the exact milestone dates Citrine had requested Gallatin offer to NorthWestern during the period in which Citrine was feigning its intent to perform.   Gallatin requested that Citrine provide its approval to execute the LGIA amendment in advance of March 2, 2026, a deadline set by NorthWestern.

72.    Citrine refused to provide a response prior to NorthWestern's March 2, 2026 deadline, offering no explanation as to why it could not confirm its consent to execute an LGIA amendment that it previously *had requested that Gallatin negotiate*.

73.    Upon information and belief, Citrine understood that failing to execute the LGIA amendment would result in a termination of the LGIA and, subsequently, the PPA, killing the Project, and Citrine sought to leverage that fact by unreasonably withholding its consent to amend the agreement in violation of

Athe MIPA, in hopes that it would provide a basis to terminate the Agreement and avoid its purchase obligations.

74.    On March 5, 2026, NorthWestern executed the LGIA amendment reflecting Citrine's requested milestone dates, preserving the value of the Project that Citrine has agreed to purchase.

75.    Execution of the LGIA amendment resolved the outstanding (though baseless) assertion that Gallatin was in default of the LGIA.

76.    Gallatin sent the executed LGIA amendment to Citrine and again requested that the Parties proceed toward closing.

77.    Finally having run out of excuses, Citrine attempted to enforce a settlement agreement that the Parties had never agreed upon or executed, and then contended that because Gallatin had "failed to cure the prior noticed breaches within the required time period (and *likely* has not satisfied a myriad of other requirements to demand a closing) . . . ***Buyer thus terminates the MIPA***." (emphasis added).

78.    On March 10, 2026, Citrine sent a letter acknowledging receipt of the LGIA amendment and again attempting to enforce the nonexistent settlement agreement and reiterating its view that the MIPA had already been terminated.

79.     In that letter, Citrine also expressed its intent to fully and finally kill the Project that it had promised to buy, by withdrawing the interconnection financial security that it is required to maintain.

## COUNT I

### (Breach of Contract)

80.     Gallatin repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

81.     Gallatin and Citrine are parties to the MIPA, which is a binding and enforceable contract.

82.     Gallatin fully performed its obligations under the MIPA.

83.     Citrine's repeated refusals to close the acquisition upon Gallatin's completion of the conditions precedent is a material breach of its covenants in Sections 2.5 and 5.5 of the MIPA.

84.     In addition, Citrine's failures to provide information regarding its readiness and willingness to adhere to its purchase obligations in response to Gallatin's reasonable request for such willingness, is a material breach of its covenants in Section 10.2 of the MIPA.

85.     Likewise, Citrine's refusal to timely grant consent to Gallatin to enter into necessary agreements for the benefit of the Project it agreed to purchase is a material breach of Citrine's covenants in Sections 5.2 and 10.2 and of the MIPA.

86.     Citrine's purported (and wrongful) termination of the MIPA in its March 1 and March 10, 2026 communications also constitutes a material breach of the MIPA, independent of the breaches set forth above.

87.     Pursuant to Section 7.2 of the MIPA, a Party may only terminate upon written notice based on a justification enumerated in Section 7.2.

88.     Because Citrine has not stated a valid basis for termination, its termination is also a material breach of the MIPA.

89.     Citrine is now liable to Gallatin for breach of contract.

90.     Gallatin has been injured by Citrine's breaches in an amount no less than the fully adjusted purchase price of the MIPA, including all damages imposed on Gallatin from NorthWestern or any other party due to defaults under the LGIA and PPA.

## COUNT II
### (Anticipatory Repudiation)

91.     Gallatin repeats and re-alleges the allegations in the preceding paragraphs as if fully set forth herein.

92.     Gallatin and Citrine are parties to the MIPA, which is a binding and enforceable contract.

93.     Beginning on October 29, 2025, through the final dismissal of the FERC Proceedings on November 21, 2025, Gallatin repeatedly sought

confirmation from Citrine that it would in fact perform its purchase obligations under the MIPA, having previously given indications that it now regretted binding itself to a purchase obligation that it no longer found economically attractive.

94.    Citrine was non-responsive, non-committal, and ultimately open in its intent not to perform its obligations under the MIPA.

95.    Gallatin sent Citrine a request for assurance on October 29, 2025, laying out the expected timeline on which it would satisfy the remaining conditions precedent to closing the acquisition.  Citrine did not provide any assurances that it intended to perform its obligations.

96.    On November 19, 21, 22, 24, 25, and 26, Gallatin reached out to Citrine repeatedly confirming its satisfaction of the outstanding conditions precedent and demanding assurances that Citrine intended to close.  Citrine provided no such confirmation.

97.    Instead, Citrine sent a letter on December 1, 2025 asserting baseless breach allegations against Gallatin that it claimed Gallatin had "no ability to cure."

98.    Citrine's communications represented an unequivocal repudiation of the MIPA.

99.    In addition, if and to the extent it is determined that Citrine was not obligated to consummate its purchase obligations on or before March 1, 2026, Citrine's purported termination of the MIPA in its March 1 and March 10, 2026

communications, without contractual basis, would constitute a repudiation of its continuing obligations under the MIPA, nonetheless.

100.  Gallatin has sustained compensatory damages of not less than the full adjusted purchase price under the MIPA as a result of Citrine's anticipatory repudiation, including all damages imposed on Gallatin from NorthWestern or any other party due to defaults under the LGIA and PPA.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment and award Plaintiff money damages in an amount to be determined at trial, but not less than the adjusted purchase price under the MIPA, plus pre-judgment interest, attorneys' fees and costs, and such other and further relief the Court deems proper.

Dated: March 11, 2026    ORRICK, HERRINGTON &
             SUTCLIFFE LLP

            By: */s/ Thomas N. Kidera*

            THOMAS N. KIDERA

            51 W. 52nd Street
            New York, NY 10019
            tkidera@orrick.com
            212-506-5277

            *Attorney for Defendant*

            GALLATIN POWER PARTNERS,
            LLC